ACCEPTED
03-17-00333-Cr
21564467
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/2/2018 5:26 PM
JEFFREY D. KYLE
CLERK

**Appellate Cause Numbers**
**03-17-00333-CR**
**03-17-00334-CR**

FILED IN
3rd COURT OF APPEALS
~~AUSTIN, TEXAS~~

1/2/2018 5:26:15 PM
JEFFREY D. KYLE
Clerk

# IN THE COURT OF APPEALS
# FOR THE THIRD DISTRICT OF TEXAS
# AT AUSTIN

_____

THE STATE OF TEXAS, Appellant

v.

BRANDOM GARRETT, Appellee

_____

On Appeal From the County Court at Law #2
Cause Numbers 2015CR1738 & 2015CR1742
Comal County, Texas
The Honorable Charles A. Stephens, II Presiding

_____

**BRIEF FOR THE STATE**

_____

**Jennifer Tharp**
**Criminal District Attorney**
**By**
**Joshua D. Presley**
**SBN: 24088254**
**Appellate Prosecutor**
**150 N. Seguin Avenue, Suite #307**
**(830) 221-1300**
**Fax (830) 608-2008**
**New Braunfels, Texas 78130**
**E-mail: preslj@co.comal.tx.us**
**Attorney for the State**

**Oral Argument Respectfully Requested**

## Identity of Parties and Counsel

**Attorney for Appellee, Brandom Garrett**

**AT TRIAL & ON APPEAL**
Lance S. Turnbow
lanceturnbow@hotmail.com
401-B South LBJ Drive, Suite 8
San Marcos, TX 78666

**Attorneys for the Appellant, The State of Texas**

**AT TRIAL**
Ms. Abigail Whitaker & Mr. Lance Kennedy
Assistant District Attorneys
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008

**ON APPEAL**
Joshua D. Presley
Assistant District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email: preslj@co.comal.tx.us

# Table of Contents

Index of Authorities ...........................................................................................v

I. Issues Presented ............................................................................................1

II. Statement of Facts ........................................................................................2

III. Statement of the Case..................................................................................7

Summary of the Argument..............................................................................17

IV. Argument ...................................................................................................18

*A. Trooper Nolan Had Reasonable Suspicion Appellee Was Speeding.* ..................................................................................20

*B. Trooper Nolan Had Reasonable Suspicion Appellee Was Driving in the Left Lane Without Passing.*...................................................26

*1. Courts have found reasonable suspicion when an officer does not observe a defendant until several miles after the sign, even when there are several entrances in between.*................27

*2. Texas Courts – including the Court of Criminal Appeals – have found reasonable suspicion of a 'left lane for passing only violation' even where the officer observed the violation for less time than in the instant case, and regardless of whether the defendant might ultimately have a defense to the conduct.*...............................................................30

*3. Based on the totality of Trooper Nolan's observations, he had reasonable suspicion regardless of whether Appellee might ultimately have a defense to the conduct, and the possibility of 'selective enforcement' was likewise irrelevant.*. ..................................................................................32

*C. The Trial Court's Findings Are Not Supported by the Record and Warrant Reversal in and of Themselves.*...........................................36

***D. The Trial Court – Even After Remand – Has Continued to Refuse to Explicitly Answer Potentially Dispositive Issues the State Raised in its May 22nd Supplemental Request for Essential Findings.*** .................................................................................43

***E. Alternatively, the Court Should Again Abate and Remand the Case and Require the Trial Court to Make Explicit Essential Findings on the State's Requested Potentially Dispositive Issuse.*** ..49

V. Prayer ...............................................................................................52

Certificate of Service ..........................................................................53

Certificate of Compliance ...................................................................53

iv

# Index of Authorities

## Cases

*Abney v. State*, 394 S.W.3d 542 (Tex. Crim.
 App. 2013)............................................................................................... 6, 27, 37

*Castro v. State*, 03-12-00730-CR, 2015 WL
 1214402 (Tex. App.—Austin Mar. 13,
 2015, pet. ref'd) (not designated for
 publication).................................................................................................14

*Cedano v. State*, 24 S.W.3d 406 (Tex.
 App.—Houston [1st Dist.] 2000, no pet.)............................................................19

*Dillard v. State*, 550 S.W.2d 45 (Tex. Crim.
 App. 1977)......................................................................................................20

*Earvin v. State*, 14-14-000702-CR, 2015
 WL 4104701 (Tex. App.—Houston [14th
 Dist.] July 7, 2015) (pet. ref'd Nov. 18,
 2015) (not designated for publication)...............................................................30

*Earvin v. State*, 2015 WL 4104701 (Tex.
 App.—Houston [14th Dist.] July 7, 2015),
 *petition for discretionary review refused*
 (Nov. 18, 2015................................................................................................27

*Garcia v. State*, 827 S.W.2d 937 (Tex. Crim.
 App. 1992).....................................................................................................20

*Gordon v. State*, 801 S.W.2d 899 (Tex.
 Crim. App. 1990) ....................................................................................... 18, 39

*Hamal v. State*, 390 S.W.3d 302 (Tex. Crim. App. 2012)................................................................19

*Jaganathan v. State*, 479 S.W.3d 244 (Tex. Crim. App. 2015), *reh'g denied* (Feb. 10, 2016)................................................................. passim

*Jaroszewicz v. Texas Dep't of Pub. Safety*, 03-15-00340-CV, 2016 WL 4506163 (Tex. App.—Austin Aug. 26, 2016, no pet.) (not designated for publication)............................................. 21, 25

*Kirkland v. State*, 400 S.W.3d 625 (Tex. App.—Beaumont 2013, pet. ref'd) .......................................................12

*Leming v. State*, 493 S.W.3d 552 (Tex. Crim. App. 2016), *reh'g denied* (July 27, 2016)................................................................. 12, 24

*MacQuarrie v. State*, 06-11-00077-CR, 2011 WL 4090047 (Tex. App.— Texarkana Sept. 15, 2011, pet. ref'd) (not designated for publication)...............................................................13

*Maki v. State*, 05-07-00486-CR, 2008 WL 2688535 (Tex. App.—Dallas July 10, 2008, pet. ref'd) (not designated for publication)...............................................................13

*Marrero v. State*, 03-14-00033-CR, 2014 WL 4400771 (Tex. App.—Austin Sept. 4, 2014, no pet.)...............................................................14

*Marrero v. State*, 03-14-00033-CR, 2016
   WL 240908 (Tex. App.—Austin Jan. 14,
   2016, no pet.) (not designated for
   publication)................................................................................................ 12, 14

*Masquelette v. State*, 579 S.W.2d 478 (Tex.
   Crim. App. 1979) ...................................................................................21

*Masquelette v. State*, 579 S.W.2d 478 (Tex.
   Crim. App. [Panel Op.] 1979) ...............................................................13

*Maysonet v. State*, 91 S.W.3d 365 (Tex.
   App.—Texarkana 2002, no pet.)............................................................21

*Maysonet v. State*, 91 S.W.3d 365 (Tex.
   App.—Texarkana 2002, no pet.)............................................................13

*McVickers v. State*, 874 S.W.2d 662 (Tex.
   Crim. App. 1993) ...................................................................................20

*Mills v. State*, 99 S.W.3d 200 (Tex. App.—
   Fort Worth 2002, no pet.).......................................................................21

*Mills v. State*, 99 S.W.3d 200 (Tex. App.—
   Fort Worth 2002, pet. ref'd)...................................................................13

*Mouton v. State*, 101 S.W.3d 686
   (Tex.App.—Texarkana 2003).................................................................26

*Mouton v. State*, 101 S.W.3d 686 (Tex.
   App.—Texarkana 2003, no pet.)..............................................................6

*Navarette v. California*, 134 S. Ct. 1683
   (2014) ....................................................................................................20

*Ochoa v. State*, 994 S.W.2d 283 (Tex. App.—El Paso 1999, no pet.). .......................................................... 12, 24

*Perales v. State*, 117 S.W.3d 434 (Tex. App.—Corpus Christi 2003) ...............................................................21

*State v. Adams*, 454 S.W.3d 48 (Tex. App.—San Antonio 2014, no pet.) ....................................................50

*State v. Cadena*, 08-09-00322-CR, 2010 WL 5541180 (Tex. App.—El Paso Dec. 29, 2010, no pet.) (not designated for publication)....................................................................21

*State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006)..............................................................................7

*State v. Dubord*, 03-15-00553-CR, 2016 WL 858929 (Tex. App.—Austin Mar. 2, 2016, no pet.) (not designated for publication).........................................................50

*State v. Elias*, 08-08-00085-CR, 2012 WL 4392245 (Tex. App.—El Paso Sept. 26, 2012, pet. ref'd) (not designated for publication)....................................................................47

*State v. Elias*, 339 S.W.3d 667 (Tex. Crim. App. 2011)...................................................................... 7, 43, 51

*State v. Garrett*, 03-17-00333-CR, 2017 WL 3044379 (Tex. App.—Austin July 14, 2017, no pet. h.) (not designated for publication)...................................................... 15, 46

*State v. Mazuca*, 375 S.W.3d 294 (Tex. Crim. App. 2012) ....................................................18

*State v. Munsey*, 424 S.W.3d 767 (Tex. App.—Fort Worth 2014)......................................19

*State v. Piedra*, 13-13-00540-CR, 2015 WL 5576346 (Tex. App.—Corpus Christi June 25, 2015, no pet.) (not designated for publication)....................................................42

*State v. Worrell*, 03-16-00749-CR, 2017 WL 3222050 (Tex. App.—Austin July 26, 2017, pet. ref'd) (not designated for publication)............................ 17, 25, 36

*Tanner v. State*, 228 S.W.3d 852 (Tex. App.—Austin 2007, no pet.)............................ 12, 19

*United States v. Castillo*, 28 F. Supp. 3d 673 (S.D. Tex. 2014)............................ 14, 22, 27

*United States v. Castillo*, 804 F.3d 361 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1481 (2016) ............................................ 26, 29

*Warren v. State*, 05-08-01431-CR, 2009 WL 3467013 (Tex. App.—Dallas Oct. 29, 2009, no pet.) (not designated for publication)............................................ 23, 39

*Whren v. US*, 517 U.S. 806 (1996) ....................................................20

## Statutes & Rules

Tex. R. App. P. 44.4.............................................................................7

Tex. R. Civ. P. 298.............................................................................15

Tex. Transp. Code Ann. § 544.011 ...................................................6, 34

x

# I. Issues Presented

1. Where the totality of the facts and circumstances – including Trooper Nolan's estimation that Appellee was speeding in light of Nolan's extensive training and experience and Nolan's confirmation of Appellee's speeding on Nolan's extensively and properly used and tested radar gun – demonstrated probable cause to believe Appellee was violating a Traffic Law, did Nolan have reasonable suspicion to conduct a traffic stop?

2. Where the totality of the facts and circumstances – including Trooper Nolan's personal observation of and video evidence confirming Appellee's driving in the left lane without passing for a longer period of time than that found sufficient in other Texas Courts – warranted reasonable suspicion that Appellee was committing the offense Driving in the Left Lane Without Passing, did the Trial Court err in granting the motion to suppress?

3. Where the Trial Court's findings indicate it apparently found Appellee was driving 75 miles in a 70-mile-per-hour zone, but the Trial Court incorrectly applied the law to this fact to conclude Appellee had not actually committed the offense of speeding, did the Trial Court err in finding no reasonable suspicion of a speeding violation and suppressing the evidence?

4. Where each of the Trial Court's detailed and explicit findings and conclusions are internally inconsistent and clearly erroneous based on established law, should the Court rely on the Trial Court's other general findings and conclusions which do not cite to and have no basis in the record?

5. Where the State timely requests findings and conclusions under *Cullen*, details the potentially dispositive issues for the Trial Court, reminds the Trial Court of the impending appellate deadline, the Trial Court apparently refuses to file any findings, the case is abated and remanded for the Trial Court to make its essential findings, and the Trial Court acknowledges the State's detailed request but nevertheless continues to refuse making explicit findings on the issues, should this Court recognize the Trial Court implicitly found said issues favored the State – as the court of appeals in *Elias* ultimately did?

6. Alternatively, where the State timely requested findings and detailed the potentially dispositive issues, should the Court abate and remand under *Cullen* and *Elias* where the Trial Court refused to make essential findings necessary for this Court to review its application of the law to the facts?

1

## II. Statement of Facts[1]

Trooper Jason Nolan is a certified peace officer and special agent with the Texas Department of Public Safety (hereinafter "DPS") (II R.R. at 6). At the time of the hearing, Nolan had served 13-and-a-half years with DPS (*id.*). Nolan had an associate's degree in criminal justice, and he was only 11 hours shy of earning his bachelor's degree when he was accepted by DPS (*id.*).

### *Speeding*

Nolan had made at least 200 stops for speeding as a trooper with DPS (*id.* at 30). Based on his training, Nolan was able to "approximate [an individual's] speed .... within 5-miles per hour" (*id.* at 15). Nolan would verify his approximations by using his radar unit (*id.*; *see also id.* at 34 (Nolan would observe speeding based on his training and confirm it with radar; "radar is really a secondary method to confirm the speed"). Nolan had specialized training and instruction on the use of his radar unit, including his initial field certification training upon joining DPS and his recertification every two years since then (*id.* at 7). In his over 13 years with DPS, Nolan had generally operated his radar unit as part of his "daily duty .... [t]raffic and accident investigation were an every day thing at DPS" (*id.*).

---

[1] The State includes its Statement of the Case after its Statement of Facts because the procedural history related to the Trial Court's findings flows more naturally after the facts elicited at the hearing.

Nolan explained that his radar worked off of the doppler principal, emitting a signal which is reflected back to the radar's antenna to determine a vehicle's speed (*see id*. at 7). The radar unit was tested in at least two different ways (*id*. at 7-8). First, Nolan would perform an internal circuit test both before and after his shifts (*id*.; *see also id*. at 32). Nolan would hold down a test button and the radar unit would run through an internal calibration test (*id*. at 27). Second, Nolan would perform a tuning fork test to calibrate the radar "the way [he] was taught. The way the manufacturer requires it calibrated" using two different forks the manufacturer provided (*id*. at 28-29, 8). The two tuning forks tested the radar unit at both 25 and 40 miles per hour to get a better reading (*id*. at 28-29, 33-34). Moreover, in the event the radar ever malfunctioned, the unit's display would read "fail" (*id*. at 29). Given Nolan's extensive training, experience and the rigorous and varied multiple daily testing of his radar unit, Nolan was confident that his over-200 speeding stops were "100-percent accurate as far as speed" and that he had not made any mistakes with his radar gun (*id*. at 30).

Nolan was on duty on the side of Interstate Highway 35 – facing the northbound lane – on May 29, 2015 (*id*. at 8). Nolan had verified that his radar unit was working "properly" and "accurately" that day at the beginning of his shift, using both the internal circuit test and the tuning forks (*id*.; *see also id*. at 16). It was still daytime at around 7:31 p.m. when Nolan observed Appellee's white Ford F-250 pickup come over the hill (*id*. at 8, 16; *see also* State's Ex. 5 at 0:50 (in the

3

far left lane)). Based on his training and experience, Nolan approximated "that [Appellee] appeared to be driving over the posted speed limit[]. Generally in that location most people are" (II R.R. at 15 (also noting many speeding violations occur at that location)). After noticing Appellee was driving in excess of the 70-mile-per-hour speed limit, Nolan used his radar gun to verify that Appellee was driving "75 in a 70" (*id.* at 15-16). Nolan also observed that Appellee was committing another traffic offense, in that Appellee was driving in the left lane without passing.

### Driving in the Left Lane Without Passing

Nolan was familiar with that section of IH35. Prior to May 29, 2015, Nolan had a "left lane for passing only" sign installed on that northbound section of 35 "because of the issues we were having" (*id.* at 23; *see also* III R.R. at 4 (front view of sign with entry ramp merging into right lane), 5 (back of sign, facing southbound)). Even traffic on the final entry ramp before Nolan's parked position should have seen the sign (II R.R. at 13, 14, 24).

In addition to speeding, when Nolan first observed Appellee come over the hill, Nolan "observed [Appellee's F-250] to be in the left lane and it was not passing" (*id.* at 15; *see also* State's Ex. 5 at 0:50). Appellee's truck was around eight to ten car lengths ahead of the truck it in the middle lane (II R.R. at 19; *see also* State's Ex. 5 at 0:50). On the video, Appellee is not passing or attempting to

4

pass another vehicle for some time (*see* State's Ex. 5 at 0:50). At around 1:23 into the video, Appellee is parallel to a vehicle in the *far right* lane, and at around 1:40 a vehicle moves into the middle lane next to Appellee (*see id.*). Nolan observed Appellee for a "[g]ood amount of time" (II R.R. at 17), noting there was plenty of time and distance for Appellee to make a safe transition back into the middle lane (*id.* at 19). After observing two traffic violations – speeding and driving in the left lane without passing – Nolan initiated a traffic stop (*id.* at 17).

### *Appellee's Motion to Suppress Hearing*

At the outset of the hearing on the motion to suppress, Appellee acknowledged that "we're just arguing about the traffic stop" (II R.R. at 5). Only one witness –Trooper Nolan –testified at the hearing on Appellee's motion to suppress (*see generally* II R.R.). The State also introduced maps, photographs of the area, and video from Trooper Nolan's dash camera (*see generally* III R.R., State's Ex. 5). Appellee introduced no evidence, cited outdated caselaw, and his cross-examination focused on arguments such as "[Trooper Nolan,] you can't say with *exact certainty* – you can't say there's *no way* [the radar gun] malfunctioned on that day" (II R.R. at 29 (emphasis added)), that it was "*possible* ... your radar is

measuring" another vehicle (*id*. at 31 (emphasis added)),[2] and that "[w]e're talking *just 5 miles over* [the speed limit], agreed?" (*id*. at 35 (emphasis added)).

In closing, the State cited Nolan's two observed traffic violations: speeding and driving in the left lane without passing, arguing he had at least reasonable suspicion – and likely probable cause – to make the traffic stops (*id*. at 35-36 (citing, *e.g.*, Tex. Transp. Code Ann. § 544.011, 544.001; *Mouton v. State*, 101 S.W.3d 686, 690 (Tex. App.—Texarkana 2003, no pet.); *Abney v. State*, 394 S.W.3d 542, 549 (Tex. Crim. App. 2013) (citing *Mouto*n with approval); *id*. at 39 (pointing out Nolan's testimony, evidence and the video showed Appellee was not passing for over a mile)).

Regarding the driving-in-the-left-lane offense, Appellee claimed notice of the sign was not an issue, and instead claimed Appellee *was* passing and giving "plenty of room" to the car behind him (II R.R. at 38). Appellee argued "[h]e wasn't somebody hanging out in the left lane, mile after mile, after mile blocking the road" (*id*.). As for Appellee's speeding, Appellee argued that under *Kelly* and "*Ochoa v. State* 994 S.W.2d," Trooper Nolan had to "explain the actual calculation" his radar gun used to determine speed (*id*. at 38-39). Appellee also minimized his 5-miles-an-hour excess of the speed limit (*see id*. at 39; *see also* I C.R. at 65 (Appellee's proposed finding for the Trial Court stated that "[t]he

---

[2] As noted *infra*, to meet its burden at the suppression hearing the State is not required to establish an offense was committed beyond a reasonable doubt, but only whether the officer had a reasonable suspicion an offense had been committed. In any event, Appellee's cross-examination which would appear to require "exact certainty" surpasses even the beyond-a-reasonable-doubt standard.

defendant's speed, 75 in a 70, was reasonable and prudent for the driving conditions at the time of the stop"); *id.* at 52 (State points out Appellee's apparent admission and incorrect standard); *id.* at 68 (Appellee argues his proposed finding was not an admission)). The Trial Court granted the motion to suppress without explaining its reasoning (*id.* at 40).

### III. Statement of the Case

In the circumstances of this case, the Trial Court is required to provide findings and conclusions adequate to allow this Court review its decision. As the Court of Criminal Appeals in *State v. Cullen* held:

> ...upon the request of the losing party on a motion to suppress evidence, the trial court shall state its essential findings. By "essential findings," we mean that the trial court must make findings of fact and conclusions of law adequate to provide an appellate court with a basis upon which to review the trial court's application of the law to the facts.

*State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006); *see also State v. Elias*, 339 S.W.3d 667, 676-77 (Tex. Crim. App. 2011) (the omission of findings and conclusions with respect to a potentially dispositive fact issue constitutes a "failure ... to act" for purposes of Tex. R. App. P. 44.4).

The State has attempted to present its case and the underlying potentially dispositive factual matters to the Court.[3] On May 1, 2017, the Trial Court signed

---

[3] The State's numerous and respectful filings, *infra*, were undertaken first in the hopes that the Trial Court would reconsider and deny the *Motion to Suppress* – potentially obviating the need

the order granting the Defendant's Motion to Suppress after the hearing (I C.R. at 19). The State timely filed its original *Request for Findings of Fact and Conclusions of Law* on May 9, 2017 (I Supp. C.R. at 4). The State timely appealed on May 19, 2017 (I C.R. at 21). The State then filed a *Supplemental Request* with the Trial Court detailing essential and potentially dispositive issues and suggesting proposed essential findings on May 22nd (I C.R. at 31).[4] Citing to the applicable portions of the record and case law, the State asked the Trial Court to make specific essential findings and conclusions as to:

### *Findings of Fact[5]*

1. Whether Trooper Nolan's Testimony at the suppression hearing was credible and whether the facts were as Trooper Nolan believed them to be, and if and to the degree the Court found it was *not*, explicit findings as to each and every assertion the Court found not credible.

2. Whether most people speed at the location on Interstate Highway 35 where Trooper Nolan first observed the Defendant (II R.R. at 15).

3. Whether Trooper Nolan had over 10 years of experience as a State Trooper and had conducted at minimum over 200 speeding stops (*id*. at 6; *id*. at 30).

---

for interlocutory appeal – and alternatively, to ensure the State could present the essential facts on potentially dispositive issues to this Court to obtain meaningful appellate review. Notwithstanding its persistent filings and its necessary arguments seeking reversal, the State has great respect for the Honorable Judge of County Court at Law #2.

[4] In its *Supplemental Request*, the State cited *State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006), *State v. Elias*, 339 S.W.3d 667, 676-77 (Tex. Crim. App. 2011) and Tex. R. App. P. 44.4. The State also filed a *Motion for Reconsideration* on May 26, 2017, citing additional case law supporting the same theories urged at the hearing (I C.R. at 49).

[5] The following – with a few minor truncations and an added footnote (n.5) – was copy/pasted from the *State's Supplemental Request* (I C.R. at 31) for the Court's convenience.

4. Whether State's Exhibits 1-4 were fair and accurate depictions of the scene, and whether Trooper Nolan's approximations of the various distances involved in this case were accurate (*see id*. at 9-14).

   Furthermore, whether [testimony and evidence related to specific locations on the maps – including the final entrance ramp and the sign – and distances involved were accurate] ....

5. Whether the area at issue in this case - a few miles north and south of Trooper Nolan's initial stationary location on IH35 - is a relatively sparsely populated stretch (with relatively fewer businesses and residences) in between the more heavily populated cities of New Braunfels and San Marcos (*see*, *e.g.*, State's Ex. 5 (Dash-Cam Video)).

6. Whether – based on his training and experience – Trooper Nolan could observe and approximate an individual's speed within five miles per hour (II R.R. at 15 (State: "Given that, plus your training, you would be able to ... approximate the defendant's speed? Nolan: "Correct .... When we're observing that speed we can generally tell within 5-miles per hour.")).

7. Whether Trooper Nolan first observed the Defendant's vehicle and estimated that the Defendant was driving over the posted speed limit of 70 miles per hour (*id*. (Nolan: "I noticed that [the Defendant's vehicle] appeared to be driving over the posted speed [limit]")).

8. Whether Trooper Nolan then confirmed his personal estimate on his radar unit (*id*. at 34). Whether Nolan's radar unit displayed that the Defendant was driving at a speed of 75 miles per hour in a 70 mile-per-hour zone (*id*. at 15-16).

9. Whether Trooper Nolan had specialized training as a peace officer on the operation of his radar unit (*id*. at 6-7).

10. Whether Trooper Nolan had field training and certification on the use of radar every two years, and whether he was certified on its use on May 29, 2015 (*id*. at 7).

11. Whether Trooper Nolan operated his radar unit daily as part of his regular duties with the Texas Department of Public Safety (DPS) (*id*. at 7).

12. Whether Trooper Nolan had performed an internal circuit test of his radar unit at the beginning of his shift on that date using two separate tuning forks, in accordance with DPS policy (*id*. at 16).[6]

13. Whether Trooper Nolan used the two separate tuning forks provided by the manufacturer to calibrate his radar at different speeds - 25 and 40 miles per hour - in order to get a more accurate reading (*id*. at 33-34).

14. Whether on May 29, 2015 - the date on which Trooper Nolan observed the Defendant's vehicle - Trooper Nolan found from his tests at the beginning of his shift that his radar unit was working properly (*id*. at 8 (State: "On the day involving this defendant ... did you find the radar unit to be working properly?" Nolan: "Yes"), 16 (Nolan says his radar unit "was working" and describes the circuit tests at the beginning of the shift).

15. Whether Trooper Nolan was trained and qualified to operate his radar device (*see*, *e.g*., *supra* (Findings on 3, 9-14)).

16. Whether Trooper Nolan understood the technique to apply and use his radar (*see*, *e.g*., *supra* (Findings on 3, 9-14)) .

17. Whether Trooper Nolan properly applied and used his radar device (*see*, *e.g*., *supra* (Findings on 3, 9-14); II R.R. at 15-16) .

18. Whether Trooper Nolan's radar read 'fail' when Trooper Nolan observed the Defendant's vehicle, indicating it was not working properly (*id*. at 29; *see also supra* (Findings on 12-14)).

19. Whether Trooper Nolan believed his accuracy in correctly giving speeding tickets based on his radar gun was 100% (II R.R. at 30).

20. Whether on May 29, 2015, the 'left lane for passing only' sign was posted after the last entrance ramp prior to where Nolan first observed the Defendant, and whether it was visible on the day in question (II R.R. at 12; *see also infra*). Whether Nolan was the individual who requested that the Texas Department of Transportation put the sign up at that location prior to that date (II R.R. at 23 (Defense: "Do you know if that left lane for passing only sign was on the road then?" Nolan: "Yes, I'm the one

---

[6] It would appear from further review of the reporter's record that Trooper Nolan performed *both* an internal circuit test *and* a separate tuning fork test (II R.R. at 7-8, 27, 28-29, 32-34).

that had it put up .... I contacted the TxDot superintendent to put [the sign] up because of the issues we were having")).

21. Whether an individual entering the final northbound ramp before Nolan's stationary position - who was observing traffic signs - would have seen the 'left lane for passing only' sign (*see* State's Ex. 4; II R.R. at 14, 24).

22. Whether the State's Exhibit 5 - a copy of Trooper Nolan's dash-cam video - was admitted into evidence at the hearing, and whether it was a fair and accurate depiction of the events recorded (State's Ex. 5).

23. Whether the Defendant was already in the far left lane when Nolan observed him come over the hill northbound on IH35 (State's Ex. 5 at :45-50). Whether it was very unlikely the Defendant had entered the highway from the most recent on-ramp, as the Defendant would have had to immediately travel across all three lanes of traffic to reach the lane where Nolan first observed him (s*ee* State's Ex. 5; State's Ex. 1-4; II R.R. at 9-14).

24. Whether the likelihood was over 50% – or likely much higher – that cars in general travelling on that section of IH35 had passed the 'left lane for passing only' sign located immediately after where the final entrance ramp joined the highway prior to Trooper Nolan's position. *See*, *e.g.*, *supra* (Findings on 4, 5, 20 & 21).

25. How far Defendant's car was ahead of the car behind him when Trooper Nolan first observed Defendant's car at the top of the hill approaching Nolan's stationary position (*see* II R.R. at 19 (around eight to ten car lengths or 50 meters); *see also* State's Ex. 5 at 0:50). Whether a 'car length' is approximately 15 feet.

26. Whether from around the 0:50 on State's Ex. 5 to 1:23, the Defendant is not passing or attempting to pass another vehicle (State's Ex. 5). Whether at 1:23, the Defendant is parallel to a vehicle in the far right lane (*id*.). Whether at 1:43, the Defendant is passing a vehicle which moved into the middle lane (*id*.).

....

11

## Conclusions of Law

1. Whether "[f]or a peace officer to stop a motorist to investigate a traffic infraction, as is the case with any investigative stop, 'proof of the actual commission of the offense is not a requisite.'" *Leming v. State*, 493 S.W.3d 552, 561 (Tex. Crim. App. 2016), *reh'g denied* (July 27, 2016).

2. Whether it is or "is not necessary to show that an individual actually violated a traffic regulation; "[i]t is sufficient to show the officer reasonably believed that a violation was in progress." *Marrero v. State*, 03-14-00033-CR, 2016 WL 240908, at *3 (Tex. App.—Austin Jan. 14, 2016, no pet.) (not designated for publication).

3. Whether "[a]n officer may not act solely on a hunch, but his determination of "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Tanner v. State*, 228 S.W.3d 852, 856 (Tex. App.—Austin 2007, no pet.)....

4. Whether a reasonable suspicion determination need not rule out the possibility of innocent conduct. *Leming v. State*, 493 S.W.3d 552, 563 (Tex. Crim. App. 2016), *reh'g denied* (July 27, 2016). "The possibility of an innocent explanation does not deprive the [detaining] officer of the capacity to entertain reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal." *Id*. at 564.

5. Whether "[i]n determining whether reasonable suspicion was present at the time of the investigatory stop, a trial court is required to disregard 'the actual subjective intent or motive of the detaining officer[.]'" *Kirkland v. State*, 400 S.W.3d 625, 629 (Tex. App.—Beaumont 2013, pet. ref'd). "Instead, the trial court looks 'to whether there was an objective justification for the detention.'" *Id*.

6. The Defendant cited *Ochoa v. State* at the hearing (II R.R. at 38). *See* 994 S.W.2d 283, 284 (Tex. App.—El Paso 1999, no pet.). Whether, as *Perales v. State* observed regarding *Ochoa,* "[m]ore recently, however, the Texarkana Court of Appeals has held that even under *Kelly,* the underlying scientific principles of radar are indisputable and valid as a matter of law." 117 S.W.3d 434, 442 (Tex. App.—Corpus Christi 2003, pet. ref'd) (citing *Maysonet v. State*, 91 S.W.3d 365, 371 (Tex. App.—

12

Texarkana 2002, no pet.), and *Masquelette v. State*, 579 S.W.2d 478, 481 (Tex. Crim. App. [Panel Op.] 1979)); *see also Mills v. State*, 99 S.W.3d 200, 202 (Tex. App.—Fort Worth 2002, pet. ref'd) (rejecting the appellant's argument regarding the scientific theory of radar based on *Ochoa*, the Court held that "[w]e agree with the principles enunciated in *Maysonet* and hold that the underlying scientific principles of radar are indisputable and valid as a matter of law"); *MacQuarrie v. State*, 06-11-00077-CR, 2011 WL 4090047, at *2 (Tex. App.—Texarkana Sept. 15, 2011, pet. ref'd) (not designated for publication) (again recognizing the underlying scientific principles of radar - the first *Kelly* factor - is indisputable and valid as a matter of law); *Maki v. State*, 05-07-00486-CR, 2008 WL 2688535, at *2 (Tex. App.—Dallas July 10, 2008, pet. ref'd) (not designated for publication) (same).

7. Whether – despite the Defendant's reliance on *Ochoa* – in accordance with the forgoing authorities, this Court concludes that the underlying scientific principles of radar are indisputable and valid as a matter of law.

8. Whether Trooper Nolan reasonably believed that the "left lane for passing only" prohibition did not allow for travelling in the far left lane to pass a vehicle in the far right lane.

9. Whether Trooper Nolan was mistaken as to the scope of the prohibition. Whether a driver may use the far left lane for passing a vehicle in the far right lane, even when the middle lane is open.

10. Whether – and despite the fact that the Defendant cross-examined Trooper Nolan about the purpose of the law (II R.R. at 21) – as the Court of Criminal Appeals has recently observed, it is inappropriate to "consider[] the purpose of the law against driving in the left lane without passing" in the reasonable suspicion determination:

    [The trooper] was not required to consider the purpose of the law in deciding whether he believed appellant had violated it. Just as running a stop sign is illegal even if it can be done safely, driving in the left lane in violation of a posted sign is illegal even if it can be done safely

    *Jaganathan v. State*, 479 S.W.3d 244, 248 (Tex. Crim. App. 2015), *reh'g denied* (Feb. 10, 2016).

13

11. Whether – and despite the fact the Defendant cross-examined Trooper Nolan about the fact that he did not stop *another* vehicle for driving in the left lane without passing (II R.R. at 32-33) – as courts have observed, "[t]o the extent there are concerns that the "Passing Only" sign is being selectively enforced, the Supreme Court has held that those concerns do not enter this Fourth Amendment calculus." *United States v. Castillo*, 28 F. Supp. 3d 673, 677 (S.D. Tex. 2014) (emphasis added), *aff'd,* 804 F.3d 361 (5th Cir. 2015).

(I C.R. at 31 (also suggesting the State's proposed findings)). The State later filed a *Notice of Past Due Findings* to ensure compliance with Tex. R. Civ. P. 297 on June 8, 2017, requesting that the Trial Court enter its findings "as soon as possible, so that the State may review and request additional findings as necessary under Tex. R. Civ. P. 298" (I Supp. C.R. at 6, 8).[7] No findings and conclusions were filed before the records were submitted to this Court, however.[8]

After both records were on file with this Court, this Court abated and remanded for the Trial Court to state its "'essential' findings of fact and conclusions of law" on the motion to suppress. *See State v. Garrett*, 03-17-00333-

---

[7] Although technically not required in a criminal case (*see Marrero v. State*, 03-14-00033-CR, 2014 WL 4400771, at *1 (Tex. App.—Austin Sept. 4, 2014, no pet.) (not designated for publication), the State filed said notice out of an abundance of caution, to ensure the Trial Court was aware of the impending appellate deadlines, and to allow the State to request additional findings as necessary. The notice also requested a ruling on the attached *State's Motion for Reconsideration*, which merely included additional case law supporting the theories urged at the hearing (*see Black v. State*, 362 S.W.3d 626, 633 (Tex. Crim. App. 2012) (noting the trial court has continuing jurisdiction over an interlocutory suppression ruling and may reconsider it throughout the course of trial)) - and included a Certificate of Presentment signed by the Trial Court's Coordinator to ensure it was brought to the Trial Court's attention. *See also cf. Castro v. State*, 03-12-00730-CR, 2015 WL 1214402, at *4 (Tex. App.—Austin Mar. 13, 2015, pet. ref'd) (not designated for publication) (noting presentation of a motion for new trial to a court coordinator can satisfy the presentation requirement for such motions); Tex. R. App. P. 33.1(a).

[8] The State also filed a motion to extend time to file the clerk's record in this Court on June 7th to give the Trial Court additional time to enter its findings and to allow the State to request additional findings; however, both the clerk's and reporter's record were on file with this Court by June 12th.

14

CR, 2017 WL 3044379, at *1 (Tex. App.—Austin July 14, 2017, no pet. h.) (not designated for publication). The Trial Court was ordered to submit such findings in a supplemental clerk's record by August 14, 2017. *Id.*

The State then filed a *Notice of the Third Court's Impending Deadline to File Findings of Fact & Conclusions of Law* with the Trial Court on August 9, 2017, in which it mentioned that "as the State indicated in its Notice of Past Due Findings ... the State may need additional time once the [Trial] Court has filed its findings and conclusions to request any necessary additional findings and conclusions before the record is sent to the Court of Appeals. *See* Tex. R. Civ. P. 298" (II Supp. C.R. at 10-11). The Trial Court received an extension from this Court until August 25th to submit its findings and subsequently filed its findings with the District Clerk on August 22nd (II Supp. C.R. at 7-9).

The State immediately set to work compiling the State's *Objections and Request for Additional Findings* pursuant to Tex. R. Civ. P. 298. Because the attorney for the State was going to be out of town from August 23rd through the 28th, he passed his work over to a colleague and asked him to file it on August 24th, since the clerk's supplemental record was due on August 25th. Although he did file the State's *Objection and Request for Additional Findings*[9] on August 24th, the Clerk submitted the supplemental record and this Court reinstated the appeal

[9] *See* III Supp. C.R. at 4 (the requested findings largely correspond to the State's May 22nd request for findings, with the exception that Finding #2 ("Whether Trooper Nolan's testimony was not credible only to the extent that it conflicted with the video") was added in direct response to the Trial Court's apparent findings, and subsequent findings have a corresponding higher number (e.g. #2 is now #3, etc.)).

15

immediately on that same date, only two days after the Trial Court filed its findings.[10] The State's *Objection and Request for Additional Findings* largely mirrored its earlier *Supplemental Request* for findings which had detailed the precise and potentially dispositive issues the State needed findings on to present its case to this Court (III Supp. C.R. at 4). The State's earlier *Supplemental Request* was acknowledged on the first page of the Trial Court's findings, though most of the essential and potentially dispositive issues were not explicitly addressed in the Trial Court's findings (II Supp. C.R. at 7).

Finally, the State filed a second *Motion to Abate & Remand, or Alternatively, to not Deem or Presume any Findings or Conclusions* in this Court on August 29, 2017 – within the 10-day period of Texas Rule of Civil Procedure 298 to request additional findings. This Court granted the alternative relief of continuing the appeal to briefing on September 18, 2017. The State now submits its Brief, asking that the Court either reverse the Trial Court's order suppressing evidence, or alternatively, abate and remand once again and require the Trial Court to enter its explicit findings on the potentially dispositive issues pointed out by the State.

---

[10] The attorney for the State asked that the State's *Objection and Request for Additional Findings* be filed before he later discovered the Clerk apparently planned to submit and actually submitted the supplemental record early – and this Court reinstated the appeal – on August 24th.

## Summary of the Argument

The Trial Court erred in granting the motion to suppress because the State presented credible evidence of reasonable suspicion to believe Appellee had committed two separate traffic violations. Moreover, Appellee's arguments at the hearing were legally erroneous, and the Trial Courts Explicit findings indicate it adopted Appellee's erroneous legal conclusions. The Trial Court's explicit findings are internally inconsistent, clearly erroneous, and warrant reversal in themselves. Moreover, because the Trial Court has had multiple opportunities to enter its explicit essential findings on requested issues, its continued refusal to do so should be interpreted as impliedly finding the facts were favorable to the State, and the Court should reverse the order suppressing the evidence. Alternatively, this Court should again abate and remand for the necessary essential findings.

## Standard of Review on a Motion to Suppress

Appellate courts will review a trial court's ruling on a motion to suppress for an abuse of discretion and will "overturn the ruling only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Worrell*, 03-16-00749-CR, 2017 WL 3222050, at *3 (Tex. App.—Austin July 26, 2017, pet. ref'd) (not designated for publication) (citing *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014). "When a trial court makes explicit fact findings, [reviewing courts will] determine whether the evidence viewed in the light most favorable to the trial court's ruling supports the fact findings. *Id.* (citing *Johnson v.*

*State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). Courts will give "almost complete deference to the trial court's determination of historical facts, but [will] review court's application of the law to those facts de novo." *Id*. (citing *Story*, 445 S.W.3d at 732). Reviewing courts are "not bound by the trial court's findings and conclusions that are not supported by the record." *Id*. (citing *State v. Whittington*, 401 S.W.3d 263, 271 (Tex. App.—San Antonio 2013, no pet.); also citing *State v. Mazuca*, 375 S.W.3d 294, 308-09 (Tex. Crim. App. 2012) ("rejecting trial court's conclusion as to 'flagrancy of the police action' that was not supported by record")).

## IV. Argument[11]

### *Reasonable Suspicion*

The Court of Criminal Appeals has held that "the Texas Constitution does not impose any greater restrictions on police conduct than those imposed by the Fourth Amendment to the United States Constitution." *Gordon v. State*, 801 S.W.2d 899, 912 (Tex. Crim. App. 1990) (adopting the objective standard in evaluating police conduct, and analyzing appellant's constitutional claims "within a normal constitutional framework"); *see also Cedano v. State*, 24 S.W.3d 406, 410 n.1 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (noting "state standards for

---

[11] Because the Trial Court's explicit findings and conclusions indicate it appears to have adopted many of Appellee's erroneous legal arguments, the State will first go through its legal standards and precedents before reaching the Trial Court's explicit findings, *infra*; the State believes ordering its brief in this manner helps further highlight the erroneous nature of the Trial Court's explicit findings and conclusions.

18

review of investigative stops are the same as federal standards"). In order to conduct a traffic stop, an officer must have reasonable suspicion. *Hamal v. State*, 390 S.W.3d 302 (Tex. Crim. App. 2012). "Reasonable suspicion exists when an officer is aware of specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is engaging in criminal activity." *Id.* at 306. Further, only "some minimal level of objective justification" is required to rise to the level of reasonable suspicion. *Id.*

The State does not have to establish with absolute certainty that a crime has occurred. *State v. Munsey*, 424 S.W.3d 767, 771 (Tex. App.—Fort Worth 2014). As stated in *Jaganathan v. State*, "[t]he question in this case is not whether appellant was guilty of the traffic offense but whether the trooper had a reasonable suspicion that [h]e was." 479 S.W.3d 244, 247 (Tex. Crim. App. 2015), *reh'g denied* (Feb. 10, 2016).

An officer's determination need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. *Tanner v. State*, 228 S.W.3d 852, 856 (Tex. App.—Austin 2007, no pet.) (citing *U.S. v. Arvizu*, 534 U.S. 266, 274 (2002)). As one Court has observed, "Justice Scalia, who found reasonable suspicion lacking in *Navarrette*, nonetheless implied that a probability of '1 in 10' or even '1 in 20' would satisfy the standard."

19

*Castillo v. State*, 28 F. Supp. 3d 673, 675 (S.D. Tex. 2014)[12], *aff'd,* 804 F.3d 361 (5th Cir. 2015).

### A. *Trooper Nolan Had Reasonable Suspicion Appellee Was Speeding.*

Texas Transportation Code Section 545.351 states that "an operator may not drive at a speed greater than is reasonable and prudent under the circumstances then existing." Section 545.352 dictates that "a speed in excess of the limits established by Subsection (b) or under another provision of this subchapter is prima facie evidence that the speed is not reasonable and prudent and that the speed is unlawful." Subsection (b) designates the lawful speed for a numbered highway to be 70 miles per hour. Further, the posted speed limit on Interstate 35 (a numbered highway) at the relevant location is 70 miles per hour (I C.R. at 34 (State's Request for a Finding on #7); II R.R. at 15)).

It has long been established that a peace officer may stop and detain a motorist when he has a reasonable basis for suspecting that the person has committed a traffic offense. *See Whren v. US*, 517 U.S. 806 (1996); *Garcia v. State*, 827 S.W.2d 937 (Tex. Crim. App. 1992); *McVickers v. State*, 874 S.W.2d 662 (Tex. Crim. App. 1993). Further, an officer does not have to identify the exact speed a vehicle is going in order to detain it for speeding. *Dillard v. State*, 550 S.W.2d 45 (Tex. Crim. App. 1977). An officer's visual perception of 'speeding,'

---

[12] Citing *Navarette v. California*, 134 S. Ct. 1683 (2014); *id.* at 1695 (Scalia, J., Ginsburg, Sotomayor and Kagan, JJ., dissenting).

alone, can provide sufficient reasonable suspicion or probable cause to justify a traffic stop. *See, e.g.*, *Jaroszewicz v. Texas Dep't of Pub. Safety*, 03-15-00340-CV, 2016 WL 4506163, at *4 (Tex. App.—Austin Aug. 26, 2016, no pet.) (not designated for publication); *State v. Cadena*, 08-09-00322-CR, 2010 WL 5541180, at *3 (Tex. App.—El Paso Dec. 29, 2010, no pet.) (not designated for publication) (evidence that officer observed speeding authorized reasonable suspicion traffic stop of defendant).

Additionally, the underlying scientific principles of radar have repeatedly been found by Texas courts to be valid as a matter of law, rejecting the holding in *Ochoa* that an officer must be able to testify to the inner workings of the radar unit in order to satisfy the first prong of the *Kelly* test. *Masquelette v. State*, 579 S.W.2d 478 (Tex. Crim. App. 1979); *Perales v. State*, 117 S.W.3d 434 (Tex. App.—Corpus Christi 2003); *Maysonet v. State*, 91 S.W.3d 365 (Tex. App.—Texarkana 2002, no pet.); *Mills v. State*, 99 S.W.3d 200 (Tex. App.—Fort Worth 2002, no pet.). The State must only prove the second and third prongs of *Kelly* when establishing the reliability of radar reading: that the officer knew how to operate the radar and that it was operated correctly on the occasion in question. *Perales v. State*, 117 S.W.3d 434 (Tex. App.—Corpus Christi 2003).

Trooper Nolan testified at the hearing on the defendant's Motion to Suppress Evidence that he was trained in the operation of his radar unit,[13] that he calibrated

---

[13] *See* I C.R. at 34 (e.g., State's Request for a Finding on #9-10); *see also* II R.R. at 6-7.

21

it at the beginning of his shift,[14] and that it was working properly on the day in question.[15] Nolan further detailed that he operated his radar gun in conformity with the manufacturer's instructions and that the reading he received was confirmed by his own observations.[16] Trooper Nolan testified that he had specific training, over ten years' experience in observing vehicles in motion and that he determined the defendant's vehicle to be speeding prior to activating his radar unit.[17] He testified that the defendant was travelling at 75 miles per hour on a section of Interstate 35 where the posted speed limit was 70 miles per hour.[18]

Indeed, even Appellee himself appeared to admit he was driving at 75 miles per hour in a 70 mile-per-hour zone; in his proposed finding of fact #5, the Appellee states: "The [Appellee's] speed, 75 in a 70, was reasonable and prudent for the driving conditions at the time of the stop" (I C.R. at 65). In his proposed conclusion of law #3, the Appellee stated "The [Appellee] was driving at a 'reasonable and prudent' speed as required by Texas Transportation Code section 545.351" (*id*. at 66).[19] However, Appellee was not being tried for speeding, and the State was not required to prove beyond a reasonable doubt that Appellee was

---

[14] *See* I C.R. at 35 (e.g., State's Request for a Finding on #12-14); *see also* II R.R. at 8, 16, 33-34.

[15] *See* I C.R. at 35 (e.g., State's Request for a Finding on #12-18); *see also* II R.R. at 8, 15-16, 29-30, 33-34.

[16] *See* I C.R. at 35 (e.g., State's Request for a Finding on #7, 13, 15-18, 19); *see also* II R.R. at 15 ("I noticed that [the Defendant's vehicle] appeared to be driving over the posted speed [limit]").

[17] *See supra*; *see also* I C.R. at 34-35 (e.g., State's Request for a Finding on #3, 6, 7, 8); II R.R. at 6, 30, 15-16, 34).

[18] *See* I C.R. at 34 (e.g., State's Request for a Finding on #8); *see also* II R.R. at 15-16, 34.

[19] *But see Jaganathan v. State*, 479 S.W.3d 244, 249 (Tex. Crim. App. 2015) (Meyers, J., Johnson and Newell, JJ., dissenting) (observing the *Jaganathan* majority found such a focus to be erroneous).

speeding to show Trooper Nolan had reasonable suspicion. *See Warren v. State*, 05-08-01431-CR, 2009 WL 3467013, at \*3 (Tex. App.—Dallas Oct. 29, 2009, no pet.) (not designated for publication) (where an appellant argued his speed of only five miles over the limit was reasonable under "545.351 of the Texas Transportation Code," and evidence from his stop should be suppressed, the Court held: "We disagree. Appellant was not tried for speeding. Nor was the State required to prove beyond a reasonable doubt that appellant was speeding in order to show Burnett had reasonable suspicion to stop appellant's vehicle....").[20]

Appellee also attempted to have the trial court hold the State's evidence to an improper – indeed, practically impossible – standard. As noted *supra*, Appellee's cross-examination focused on arguments such as "[Trooper Nolan,] you can't say with *exact certainty* – you can't say there's *no way* [the radar gun] malfunctioned on that day" (II R.R. at 29 (emphasis added)), that it was "*possible* ... [Nolan's] radar [was] measuring" another vehicle (*id*. at 31 (emphasis added)), and that "[w]e're talking *just 5 miles over* [the speed limit], agreed?" (*id*. at 35 (emphasis added)). However, the State is not required to establish an offense was

---

[20] *See also State v. Garcia*, 08-15-00081-CR, 2017 WL 2570935, at \*2 (Tex. App.—El Paso June 14, 2017, pet. ref'd) (not designated for publication) (citing *Madden v. State*, 242 S.W.3d 504, 508 n.7 (Tex. Crim. App. 2007)), and noting that although:

> The trial court concluded that Garcia did not violate Section 545.157(b)(2)(A) ... the issue before the trial court *was not whether Garcia was ultimately guilty of the traffic violation*. The State was not required to prove beyond a reasonable doubt that Garcia actually committed the traffic offense. The issue was *whether an objective [reasonable suspicion] basis for the stop existed based on the totality of the circumstances*.

(emphasis added)).

committed beyond a reasonable doubt, but only whether the officer had a reasonable suspicion an offense had been committed. In any event, Appellee's cross-examination – which would appear to require "exact certainty" – surpasses even the beyond-a-reasonable-doubt standard. *See also Leming*, 493 S.W.3d at 564 ("The possibility of an innocent explanation does not deprive the [detaining] officer of the capacity to entertain reasonable suspicion of criminal conduct). Unfortunately, as noted *infra,* the Trial Court's actual findings and conclusions indicate it adopted Appellee's improper and impossible standard.

The only other attack by defense counsel on speeding as a basis for the traffic stop was that *Ochoa v. State* required that the officer testify to the underlying scientific principles of the radar for the Court to find that the use of radar was scientifically sound under *Kelly* (II R.R. at 38). However, as several courts cited above have observed, this is an erroneous position.[21] Since the underlying scientific principles are valid as a matter of law – as the Trial Court acknowledged in its conclusions (II Supp. C.R. at 9 (Conclusion #5)) – Trooper Nolan was only required to truthfully testify that he knew how to operate the radar and that he did it correctly on the day in question, as he did.[22] Furthermore, the determination by Trooper Nolan that the defendant was speeding prior to activating his radar unit – *standing alone* – was sufficient to form reasonable suspicion given

---

[21] *Supra*, citing *Masquelette*, 579 S.W.2d 478;. *Perales*, 117 S.W.3d 434; *Maysonet*, 91 S.W.3d 365; *Mills*, 99 S.W.3d 200.

[22] *See* I C.R. at 34-35 (e.g., State's Requested Findings on #6-19); *see also* II R.R. at 6-7, 15-16, 29-30, 33-34.

his training and experience. *See, e.g.*, *Jaroszewicz v. Texas Dep't of Pub. Safety*, 03-15-00340-CV, 2016 WL 4506163, at *4 (Tex. App.—Austin Aug. 26, 2016, no pet.) (not designated for publication) ("Even without crediting the radar evidence, the ALJ could have found that the officer's visual observation that Jaroszewicz's vehicle was traveling at 'a high rate of speed for the 30 mph zone' was sufficient to establish reasonable suspicion for the officer to conduct the traffic stop"); *State v. Cadena*, 08-09-00322-CR, 2010 WL 5541180, at *3 (Tex. App.—El Paso Dec. 29, 2010, no pet.) (not designated for publication) (evidence that officer observed speeding authorized reasonable suspicion traffic stop of defendant).

Based on his training and experience, upon observing Appellee travelling at around 75 miles per hour in a 70 zone, Trooper Nolan likely had probable cause – and in any event, reasonable suspicion – to pull Appellee over for speeding. *See Jaroszewicz*, 2016 WL 4506163 at *4; *Cadena*, 2010 WL 5541180 at *3. The totality of the circumstances supporting probable cause only grew stronger based on Nolan's extensive training, understanding, testing and experience with his radar gun generally and on the day in question. Nolan properly verified his estimate of Appellee's speed on his radar gun, and any conclusion from the Trial Court that Nolan did not properly use his radar gun on the day in question would not be supported by the record. The Trial Court abused its discretion in denying the motion to suppress, and this Court should reverse and order the Trial Court to deny the motion to suppress on this basis. *Worrell*, 2017 WL 3222050 at *3; *Hamal*, 390

25

S.W.3d at 306; *Munsey*, 424 S.W.3d at 771; *Jaganathan,* 479 S.W.3d at 247; *Jaroszewicz,* 2016 WL 4506163 at \*4; *see also infra* (Trial Court's Findings and Conclusions Unsupported and Insufficient).

### B. Trooper Nolan Had Reasonable Suspicion Appellee Was Driving in the Left Lane Without Passing.

Texas Transportation Code Section 544.044 requires that "[t]he operator of a vehicle or streetcar shall comply with an applicable official traffic-control device placed as provided by this subtitle…" An official traffic-control device includes a sign that is consistent with Subtitle C of the Transportation Code, put up by a public body, and used to regulate, warn, or guide traffic. Tex. Transp. Code. Ann. § 541.304 (West, Westlaw through 2017 R.S.). Section 544.011 states "[i]f, on a highway having more than one lane with vehicles traveling in the same direction, the Texas Department of Transportation or a local authority places a sign that directs slower traffic to travel in a lane other than the farthest left lane, the sign must read "left lane for passing only." A sign erected by TxDOT in accordance with Section 544.011 is an official traffic control device and must be complied with. *Mouton v. State*, 101 S.W.3d 686, 689 (Tex.App.—Texarkana 2003).

In order for a motorist to violate Section 544.011 for travelling in the left lane without passing, there must be a sign within a reasonable distance of the traffic stop. *United States v. Castillo*, 804 F.3d 361, 365 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1481 (2016). However, an officer does not need conclusive

26

proof that the person actually saw the sign prohibiting the conduct, but only a reasonable suspicion that he had seen it. *Id.* at 363; *Navarette v. California*, 134 S.Ct. 1683 (2014); *Abney v. State*, 394 S.W.3d 542, 549 (Tex. Crim. App. 2013). Courts have found reasonable suspicion existed when the officer first saw the motorist a few miles past the sign. *United States v. Castillo*, 28 F. Supp. 3d 673, 673 (S.D. Tex. 2014), *aff'd,* 804 F.3d 361 (5th Cir. 2015) (five miles from sign); *Mouton v. State* at 689 (three to four miles from sign); *Earvin v. State*, 2015 WL 4104701, at *5 (Tex. App.—Houston [14th Dist.] July 7, 2015), *petition for discretionary review refused* (Nov. 18, 2015) (six miles from sign); *contrast with Abney* at 549 (15 miles from the sign was too far).

1. ***Courts have found reasonable suspicion when an officer does not observe a defendant until several miles after the sign, even when there are several entrances in between.[23]***

Notably, Courts have even found reasonable suspicion where multiple points of entry existed between the sign and the point at which the officer observed the motorist. In *U.S. v. Castillo*, D.P.S. Trooper Collins was parked off of the highway when he observed a Ford Explorer travelling in the left-hand lane. *United States v. Castillo*, 28 F. Supp. 3d 673, 674 (S.D. Tex. 2014), *aff'd,* 804 F.3d 361 (5th Cir. 2015). There was a "Left Lane for Passing Only" sign roughly 5.3 miles behind where Collins first saw the Explorer. *Id*. Furthermore, in that 5.3-mile interval, the

---

[23] As noted *supra*, Appellee never argued that he had not seen the sign in this case; he argued that issue was 'irrelevant' because he claimed he was passing.

highway intersected "several county roads and turnarounds, and two exit and entrance ramps." *Id*. The trooper followed the Explorer; when the young female passenger averted her eyes, Trooper Collins pulled the vehicle over, believing it might be a human trafficking situation. *Id*. at 674. The defendants were charged with bringing in and harboring aliens; they filed a motion to suppress, arguing Collins did not have reasonable suspicion to believe they had committed a traffic violation. *Id*.

The dispositive question in *Castillo* was "whether Collins had reasonable suspicion that the Explorer passed" the "Left Lane for Passing Only" sign 5.3 miles before Collins first saw them. *Id*. at 675. At the outside, the district court observed that:

> [a] Supreme Court decision from earlier this year reiterates this relatively low "reasonable suspicion" threshold, observing that the "level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." Justice Scalia, who found reasonable suspicion lacking in *Navarette,* nonetheless implied that a probability of "1 in 10" or even "1 in 20" would satisfy the standard.

*Id.* at 675 (citing *Navarette v. California*, 134 S. Ct. 1683 (2014); *id*. at 1695 (Scalia, J., Ginsburg, Sotomayor and Kagan, JJ., dissenting)).

The district court then observed that a "substantially higher probability exists" that the defendants had seen the "Passing Only" sign. *Id*. While there were "two on-ramps, several county roads, and a few turnarounds" in the 5.3 miles between the sign and the trooper's locations, that stretch did not pass through

28

heavily populated areas. *Id*. at 676. The district court recognized that the reasonable suspicion standard required it to "make the following probabilistic determination: What percentage of vehicles driving on [that highway] at the exact point where Collins first observed the Explorer had passed the sign located 5.3 miles behind them?" *Id*. The district court ultimately concluded the likelihood was "over 50%, and likely much higher" – well above the "1 in 10" or "1 in 20" odds it believed Scalia would have found sufficient to satisfy the reasonable suspicion standard. *Id*. Determining that "the facts of this case seem to easily surmount the threshold for reasonable suspicion," the district court rejected the defendant's claim that the stop violated the Fourth Amendment and denied the motion to suppress. *Id*. at 677.

The Fifth Circuit affirmed, noting that "Texas courts have found valid stops that occurred between three and six miles from a sign." *United States v. Castillo*, 804 F.3d 361, 365 (5th Cir. 2015), *cert. denied,* 136 S. Ct. 1481 (2016). Although the defendants cited *United States v. Garcia*, the Fifth Circuit rejected that case, observing that:

> We are not persuaded by *Garcia*'s suggestion that an officer must have *specific* knowledge that the suspect passed the sign. *See* 976 F.Supp.2d at 864 (concluding the officer lacked reasonable suspicion because he "had absolutely no way of knowing when [the defendant] entered the highway"). To conclude that an officer does not have reasonable suspicion unless he knows the defendant passed the sign is essentially to require *certainty* that a violation occurred. This would raise the standard for reasonable suspicion far above probable cause or even a preponderance of the evidence, in contravention of the Supreme Court's instructions.

*Id.* at 366. The Supreme Court denied certiorari from the Fifth Circuit's decision. *Id*. Another court of appeals – citing *Castillo* – upheld a stop similar to Appellee's, observing that "[a]n officer is not required to visually observe a defendant passing a traffic control device." *Earvin v. State*, 14-14-000702-CR, 2015 WL 4104701, at *4 (Tex. App.—Houston [14th Dist.] July 7, 2015) (pet. ref'd Nov. 18, 2015) (not designated for publication).

2. ***Texas Courts – including the Court of Criminal Appeals – have found reasonable suspicion of a 'left lane for passing only violation' even where the officer observed the violation for less time than in the instant case, and regardless of whether the defendant might ultimately have a defense to the conduct.***

Although Appellee argued at the hearing, that "[h]e wasn't somebody hanging out in the left lane, mile after mile, after mile blocking the road," (II R.R. at 38), that is not the standard. Notably, *Earvin* found the record supported a finding that the officer reasonably believed the defendant committed "left lane for passing only" violation when he observed him failing to pass anyone for a period of "twenty to thirty seconds." 2015 WL 4104701, at *1, *4. The Court of Criminal Appeals refused Earvin's petition for discretionary review; indeed, that Court has upheld a finding of reasonable suspicion for travelling in the left lane for even less time.

In *Jaganathan v. State*, the Trooper observed the appellant driving in the left lane for around 22 seconds:

[a]ppellant passed a "Left Lane for Passing Only" sign. About four or five seconds later, while Trooper Norsworthy was still in the right lane, he passed the sign. Appellant's vehicle continued to travel in the left lane. Another four or five seconds later, Trooper Norsworthy moved out of the right lane, across the middle lane, and into the left lane. The Trooper then followed behind appellant's vehicle in the left lane for ten to twelve seconds. During this interval, *the middle lane was clear of traffic*, and appellant was not passing any other vehicles. Appellant turned on her left turn signal, then turned it off and turned on her right turn signal, and then moved into the middle lane. Trooper Norsworthy turned on his overhead lights, and the two vehicles pulled to the side of the road

479 S.W.3d 244, 246 (Tex. Crim. App. 2015), *reh'g denied* (Feb. 10, 2016) (emphasis added). Although the trial court denied the motion to suppress, the lower court of appeals reversed, suggesting several justifications for the appellant's failure to move over. *Id*. Among other reasons, the court of appeals concluded that the trooper "did not follow appellant for a sufficient amount of time or for a sufficient distance to conclude that appellant committed a violation," also stating that "Trooper Norsworthy had 'actually followed appellant in the left lane for only twelve seconds before appellant began pulling over.'" *Id*. at 246-47. It also considered the fact that the appellant had not "frustrated the purpose of the 'Left Lane for Passing Only'" sign because she had not impeded traffic or put others' safety at risk. *Id*. at 247.

The Court of Criminal Appeals reversed the intermediate appellate court, concluding there *was* reasonable suspicion of a traffic violation. The State argued that it was improper to consider whether the appellant had potential justifications for not moving out of the left lane; while "such matters might entitle a defendant to

an instruction on necessity if she were being *tried* for a traffic violation," they were not relevant to whether the officer had reasonable suspicion to stop her. *Id*. (emphasis added). The Court agreed, observing that "[t]he question in this case is not whether appellant was guilty of the traffic offense but whether the trooper had a reasonable suspicion that she was." *Id*. "An officer's suspicion is not unreasonable just because facts surrounding a suspected offense might ultimately show a defense to conduct." *Id.* at 248.[24] The Court also recognized that it was incorrect for the lower court to suggest the trooper should have considered 'the purpose of the law' – i.e. safety – in deciding whether he suspected the appellant had violated it. *Id*.

### 3. Based on the totality of Trooper Nolan's observations, he had reasonable suspicion regardless of whether Appellee might ultimately have a defense to the conduct, and the possibility of 'selective enforcement' was likewise irrelevant.

As the majority in *Jaganathan* concluded, it is incorrect to focus on an defendant's "possible defenses to [a traffic offense] rather than whether the officer simply had a reasonable suspicion" to believe a traffic offense had occurred. *See*

---

[24] The *Jaganathan* Court explicitly rejected findings similar to what the Appellee proposed (*see* I C.R. at 65 (e.g., Findings 3 & 5, in which Appellee is trying to argue facts which might show a defense to conviction for the offense)), noting such findings do not vitiate the trooper's reasonable suspicion of a traffic offense. Such facts would only matter if the facts establishing it were so obvious that an objective officer would be unreasonable in failing to realize the conduct was allowed by law. *See Jaganathan,* 479 S.W.3d at 248. A possibility that a defendant has a defense – e.g. "because the white car or the officer's car might have made it unsafe to move to the middle lane" – would not preclude reasonable suspicion, because "[t]he reasonable suspicion standard 'accepts the risk that officers may stop innocent people.'" *Id*.

*Jaganathan v. State*, 479 S.W.3d 244, 249 (Tex. Crim. App. 2015) (Meyers, J., Johnson and Newell, JJ., dissenting) (observing the majority found such a focus to be erroneous). Although Appellee also cross-examined Trooper Nolan about the purpose of the law (II R.R. at 21-22), *Jaganathan* observed that it is inappropriate to "consider[] the purpose of the law against driving in the left lane without passing" in the reasonable suspicion determination:

> [The trooper] was not required to consider the purpose of the law in deciding whether he believed appellant had violated it. Just as running a stop sign is illegal even if it can be done safely, driving in the left lane in violation of a posted sign is illegal even if it can be done safely

*Jaganathan*, 479 S.W.3d at 248. Finally, Appellee tried to imply Trooper Nolan was 'selectively enforcing' the statute (II R.R. at 24-25, 32-34); however, this allegation – even if it was true – is irrelevant to the reasonable suspicion analysis: *See Castillo*, 28 F. Supp. 3d at 677 ("[t]o the extent there are concerns that the 'Passing Only' sign is being selectively enforced, the Supreme Court has held that those concerns do not enter this Fourth Amendment calculus") (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

In evaluating whether a motorist was passing or not, the courts have considered the distance or time the officer observed the person driving in the left lane. *Jaganathan*, 479 S.W.3d at 246 (around 22 seconds); *Earvin*, 2015 WL 4104701 at *5 (20-30 seconds where individual was not passing or preparing to pass); *Mouton v. State*, 101 S.W.3d at 690 (officer followed for at least a mile).

33

Another consideration is the presence of other traffic on the road. In *Earvin*, the defendant was actually driving slightly behind another vehicle, but did not pass it for the 20-30 seconds which the officer observed him. 2015 WL 4104701 at *1. In other cases, the factual background is silent as to whether other cars were present on the road.

Trooper Nolan testified at the hearing that he observed the defendant driving in the left lane of I-35 and not passing any other vehicles (*see* State's Ex. 5 at 0:50 (Defendant is not passing anyone), 1:23 (Defendant finally parallel to car in far right lane, but no car in middle lane), 1:43 (Defendant is finally passing a car which moved into the middle lane);[25] *compare with Jaganathan*, 479 S.W.3d at 246 (middle lane clear of traffic while the defendant drives in left lane for 22 seconds). The stretch of highway in question is outside of the New Braunfels city limits and is fairly rural with limited entry points to the interstate.[26] Trooper Nolan testified that the "Left Lane for Passing Only" sign was posted approximately a half of a mile prior to where he first saw the defendant.[27] The picture of the sign introduced as evidence clearly shows that the sign was posted in conformity with the requirements of Section 544.011 of the Texas Transportation Code.[28] Trooper Nolan further testified that the last possible entrance to the interstate (prior to the

---

[25] *See also* I C.R. at 35-36 (e.g., State's Request for Findings on #20-26); *see also* II R.R. at 9-14, 15, 19, 23-24).

[26] *See*, e.g., I C.R. at 34 (e.g., State's Request for a Finding on #5); III R.R. at 2-5, State's Ex. 1 & 2 (maps show rural area with relatively few roads); State's Ex. 3 & 4 (pictures of area before and after sign show rural, sparsely populated surroundings), State's Ex. 5 (same).

[27] *See* I C.R. at 33-36 (e.g., State's Request for Findings on #4, 20-24); II R.R. at 9-14, 23-24.

[28] III R.R. at 4; *see also* Tex. Transp. Code Ann. § 544.011.

point where he observed the defendant) was before the sign and that it was very likely that the defendant would have seen it, even if he had entered the highway at that point.[29] Indeed, Appellee did not contest that he had seen the sign in closing (II R.R. at 38 ("...all this about the sign doesn't even matter, Judge. He was passing..."), and Appellee's own proposed finding of fact appears to admit he passed the sign (I C.R. at 65 (Appellee's Proposed Finding #4 states "The [Appellee] passed the 'Left Lane for Passing Only' sign but it is of no relevance because the [Appellee] was in fact 'passing'").

When Trooper Nolan first observed the defendant's vehicle, he was in the left lane well ahead of the vehicle in the center lane.[30] Although the camera loses sight of the defendant's vehicle, Trooper Nolan testified that he had eyes on him the majority of the time, and that he never saw him leave the left lane from when he first saw him until he turned his lights on to conduct a traffic stop.[31] Trooper Nolan observed the defendant for approximately 1.5 miles (approximately 30 seconds). *See id.* (n.31). At no point during that time did the defendant pass or attempt to pass another vehicle. *See id.*; *compare with Jaganathan*, 479 S.W.3d at 246 (around 22 seconds). Therefore, Trooper Nolan had sufficient reasonable suspicion to pull over Appellee for driving in the left lane without passing shortly

---

[29] *See*, e.g., I C.R. at 33-36 (e.g., State's Request for Findings on #4, 20-24); II R.R. at 9-14, 23-24.

[30] *See* I C.R. at 33-36 (e.g. State's Request for Findings on #4, 22-23, 25); II R.R. at 15, 19; State's Ex. 5 at 0:50.

[31] *See* I C.R. at 36 (e.g. State's Request for Findings on #23, 25-26); II R.R. at 9-14, 17-21; State's Ex. 5 at 0:50-1:43.

after a posted sign after observing him travelling in the left lane of IH35 for approximately 30 seconds while not passing or attempting to pass another vehicle. The Court should likewise find the Trial Court abused its discretion in denying the motion to suppress on this basis, reverse and order the Trial Court to deny the motion to suppress. *Jaganathan*, 479 S.W.3d at 246-47; *Hamal*, 390 S.W.3d at 306; *Munsey*, 424 S.W.3d at 771; *see also infra* (Trial Court's Findings and Conclusions Unsupported and Insufficient).

### C. The Trial Court's Findings Are Not Supported by the Record and Warrant Reversal in and of Themselves.

As noted *supra*, Courts will give "almost complete deference to the trial court's determination of historical facts, but [will] review court's application of the law to those facts de novo." *Worrell*, 2017 WL 3222050, at *3. Reviewing courts are "not bound by the trial court's findings and conclusions that are not supported by the record." *Id.*; *see also Mazuca*, 375 S.W.3d at 308-09 ("rejecting trial court's conclusion as to 'flagrancy of the police action' that was not supported by record")).

In the instant case, as noted in above 'speeding' and 'driving in the left lane without passing' sections, Appellee's cross-examination and arguments at the hearing were contrary to established law. Unfortunately, the Trial Court's explicit

findings and conclusions[32] indicate it adopted Appellee's erroneous positions, were not supported by the record, internally inconsistent, contrary to established law and weigh in favor of disregarding them entirely and reversing the order of suppression.

### *Trial Court's[33] Finding #2*

Although the Court's Finding #2 finds the Trooper's testimony regarding whether the Appellee had seen the traffic control device 'not credible' – apparently because it may have been "speculative" (II Supp. C.R. at 7) –as noted in several cases,[34] an officer does not need conclusive proof that the person actually saw the sign prohibiting the conduct, but only a reasonable suspicion that he had seen it. *Castillo*, 804 F.3d at 363; *Navarette v. California*, 134 S.Ct. 1683 (2014); *Abney v. State*, 394 S.W.3d 542, 549 (Tex. Crim. App. 2013). Indeed, several courts have upheld reasonable suspicion stops when the officer essentially "speculated" that the defendant had passed the traffic control device much further back – with a corresponding lesser probability – than in the instant case. *See*, *e.g*., *Castillo*, 28 F. Supp. 3d at 674-75 ("Left Lane for Passing Only" sign roughly 5.3 miles behind where officer first saw the defendant; also observed Justice Scalia's dissenting

---

[32] The Trial Court again failed to make explicit essential findings addressing the potentially dispositive issues (*see infra*).

[33] Most of the following arguments were also submitted to the Trial Court in the *State's Respectful Objection to the Court's Findings and Conclusions & Request for Additional Findings and Conclusions Under Tex. R. Civ. P. 298* (III Supp. C.R. at 4 (as noted, filed two days after the Trial Court's findings, the day before the record was due, but just subsequent to the filing of the supplemental record in this Court)).

[34] Including those cited in the State's *Motion for Rehearing* (I C.R. at 49 (at page 6 of the *Motion*)).

37

opinion in *Navarette* that a probability of "1 in 10" or even "1 in 20" would satisfy the reasonable suspicion standard); *Castillo*, 804 F.3d at 365 (the Fifth Circuit rejected "*Garcia*'s suggestion that an officer must have *specific* knowledge that the suspect passed the sign," further noting that "Texas courts have found valid stops that occurred between three and six miles from a sign") (emphasis in original); *Hamal*, 390 S.W.3d at 306 ("Reasonable suspicion exists when an officer is aware of specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is engaging in criminal activity"). As noted above, even Appellee did not argue and appeared to admit he had seen the sign (II R.R. at 38; I C.R. at 65). Furthermore, reasonable suspicion *is* 'speculation,' not certainty, as the Appellee tried to argue at the hearing (*see* II R.R. at 29, 31). The Trial Court apparently adopted Appellee's erroneous and practically impossible standard, and this finding was not supported by the record. *See supra*.

### Trial Court's Findings #3, 5, 6, 7 and 9

In Findings 3, 5 and 7, the Trial Court found Nolan's testimony that he observed Appellee travelling over the limit of 70 miles per hour to be "not credible;" the Court states that "[t]he [Appellee's] vehicle did not appear to be travelling any faster or slower than any other vehicle travelling in any lane, including the 'passing lane' prior to the [Appellee's] vehicle" (II Supp. C.R. at 7).

38

There are a few problems with these findings. First, to the extent the Trial Court is implying 'selective enforcement' of the speeding statute, that is irrelevant to the reasonable suspicion analysis. *See Castillo*, 28 F. Supp. 3d at 677; *see also Gordon*, 801 S.W.2d at 912 (no 'pretextual stop' doctrine; the subjective intent of an officer is irrelevant). Second, the Trial Court makes no finding as to "[w]hether most people speed at the location on Interstate Highway 35 where Trooper Nolan first observed the [Appellee]," though the State requested one.[35] In fact, in Finding 6, the Court seems to credit Nolan's testimony that "[g]enerally in that location most people are [speeding]" (II Supp. C.R. at 7). If most people are speeding in that location (Finding 6), and Appellee was not travelling "slower than any other vehicle travelling in any lane," (Finding 5) then more likely than not, Appellee was speeding. This is more than is required to show reasonable suspicion or even probable cause of speeding. Moreover, the Trial Court appears to rely (*see*, *e.g.*, Finding 6) on Appellee's proposed finding that "[t]he [Appellee's] speed, 75 in a 70, was reasonable and prudent for the driving conditions at the time of the stop" (I C.R. at 65).[36] However, as the State pointed out in its *Motion for Reconsideration*, "the State is not required to prove beyond a reasonable doubt that the [Appellee] was speeding to show Trooper Nolan had reasonable suspicion."[37]

---

[35] See I C.R. at 32 (Request for a Finding on #2).

[36] The Trial Court appears to assert that speeding is relative, e.g.'if all cars are driving 90 in a 75-mile-per-hour zone, a trooper cannot have reasonable suspicion that a given defendant was speeding, even though he was driving 90 in a 75 zone.'

[37] I C.R. at 49 (citing *Warren v. State*, 2009 WL 3467013 at *3).

Finding 7 is vague, in that it merely states the Appellee "was not traveling at a 'high rate of speed.'" The Court does not explicitly define what it believes constitutes a 'high rate of speed' – whether it is evaluating that speed in comparison to the posted speed limit or to the relative speed of other cars on the highway. The Trial Court should have made explicit findings regarding exactly how fast the evidence showed Appellee was driving (e.g. 75 miles per hour) and how far above the posted speed limit that was (e.g. five miles per hour above the 70-mile-per-hour posted limit).[38] Moreover, if the Court believes the reason the Appellee was not speeding was because '75 in a 70 was reasonable and prudent for the driving conditions,' the Trial Court should have explicitly stated that was its basis.

Finally, the foregoing findings are internally inconsistent with Finding 9. Despite Trooper Nolan's testimony that it was his job to determine which vehicle's speed the radar "cone" was picking up – and his testimony that he has never made a mistake when determining which vehicle's speed he was looking at – the Court noted he did not testify there was "no possibility that the radar had picked up the speed of another vehicle...." (II Supp. C.R. at 8 (Finding 9)). The Trial Court made no finding that Nolan was not credible when he stated his radar gun showed a finding of 75 miles per hour in a 70 mile-per-hour zone, despite the State's requests. The Trial Court appears to conclude there is a "possibility" the radar cone

---

[38] *See* I C.R. at 32 (e.g., State's Request for Findings on #6-8 related to Appellee's actual speed).

40

showed someone else around Defendant was traveling at 75 miles per hour in a 70-mile-per-hour zone. Aside from the fact that the mere 'possibility' of innocent conduct does not vitiate reasonable suspicion,[39] assume for the sake of argument that Trooper Nolan **did** read the speed of another "vehicle in the area at the same time" (II Supp. C.R. at 8 (Finding 9)). According to the Trial Court's other findings, "[t]he [Appellee's] vehicle did not appear to be travelling any ... *slower than any other vehicle travelling in any lane*...." (*id.* at 7-8 (Finding 5) (emphasis added)). Even if Nolan's radar gun showed a vehicle "around" Appellee was traveling at 75 in a 70 zone, if Appellee was not traveling slower than any other vehicle, Appellee was traveling at least 75 in a 70-mile-per-hour zone, and the Trial Court should have entered an express finding to that effect. In any event, based on the foregoing, it appears the Trial Court impliedly found Appellee was speeding at 75 in a 70 zone, and this Court should reverse the Trial Court's order of suppression on this basis.[40]

Based on the significant problems with all findings in which the Trial Court explicitly details the basis for its 'not credible' determination, this Court should

---

[39] Once again, the Trial Court appears to have adopted Appellee's erroneous and practically unattainable standard of 'absolute certainty,' which is far more than reasonable suspicion requires. As the *Jaganathan* Court noted:

"A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." The reasonable suspicion standard "accepts the risk that officers may stop innocent people." The mere possibility that an act is justified will not negate reasonable suspicion.

479 S.W.3d at 248.

[40] *See also* I C.R. at 65 (in his own proposed finding of fact #5, Appellee states: "The [Appellee's] speed, 75 in a 70, was reasonable and prudent for the driving conditions at the time of the stop," appearing to admit he was speeding).

also reject the Trial Court's general 'not credible' findings which did not provide an explicit basis (II Supp. C.R. at 7-8 (Findings 1 and 8)). Additionally, those findings cite – and are inconsistent with – the video, which this Court may review de novo.[41] *See* State's Ex. 5 at 0:50. Moreover, Finding 8 also appears to conflict with Findings 3 and 5; the Trial Court asserts in Finding 8 that Appellee is passing another vehicle throughout the video, but in Findings 3 and 5, the Trial Court asserts Appellee is not travelling faster than "any other vehicle travelling in any lane" (*see* II Supp. C.R. at 7-8). Because the Trial Court's findings are conflicting and incorrectly apply the law to the facts, its conclusions are also incorrect and not supported by the record (*see* II Supp. C.R. at 8-9). Furthermore, the Trial Court made these conclusions without explicitly making essential findings on the State's requested and potentially dispositive issues (I C.R. at 32-36 (e.g. State's Request for Findings on #6-19, 20-26); *see also* III Supp. C.R. at 4 (Objections and Request for Additional Findings)).

Because the Trial Court failed to make the requested explicit essential findings, and because the Trial Court's explicit findings and conclusions indicate it adopted Appellee's erroneous positions, were not supported by the record, were

---

[41] *See State v. Piedra*, 13-13-00540-CR, 2015 WL 5576346, at *5 (Tex. App.—Corpus Christi June 25, 2015, no pet.) (not designated for publication) (where the Court of Appeals – in reversing the trial court's granting of a motion to suppress – noted that where "'the nature of the video evidence does not pivot on an evaluation of credibility and demeanor[,]'and where the trial court makes no finding that a witness did not actually see what was depicted in the video, it is acceptable to view the video evidence de novo"). In the instant case, not only did the Trial Court never make a finding the Trooper did not see what was depicted in the video, the evidence would not have supported such a finding if it had.

internally inconsistent and were contrary to established law, the Trial Court's decision was "arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" See *Worrell*, 2017 WL 3222050 at \*3. Accordingly, this Court should reject the Trial Court's findings and conclusions, find the Trial Court abused its discretion, and reverse the order of suppression. *See id.* at \*3; *see also Mazuca*, 375 S.W.3d at 308-09.[42] Alternatively, the Court should abate and remand again for the essential findings. *But see infra*.

### D. The Trial Court – Even After Remand – Has Continued to Refuse to Explicitly Answer Potentially Dispositive Issues the State Raised in its May 22nd Supplemental Request for Essential Findings.

In *State v. Elias*, the trial court granted the defendant's motion to suppress evidence. Although the court of appeals affirmed the case, the Court of Criminal Appeals reversed, noting the court of appeals "should have remanded the cause to the trial court for entry of additional, specific findings of fact" with respect to a potentially dispositive issue. 339 S.W.3d 667, 668 (Tex. Crim. App. 2011).

In *Elias*, only one witness – a sheriff's deputy – testified at the pretrial hearing. *Id*. at 669. He testified that the witness may have failed to signal a right turn at a stop sign, potentially involving a violation of Texas Transportation Code § 545.104(a) (requiring a driver to use a signal when turning) or § 545.104(b)

---

[42] The State also argues the Trial Court erred in not granting its *Motion for Reconsideration* and reverse its order suppressing the evidence. (*see* I C.R. at 49; I Supp. C.R. at 6; II Supp. C.R. at 7). However, in the event the Court reverses the Order of Suppression, this issue will be moot.

(requiring a driver to signal his intention to turn continuously for at least 100 feet before the turn). *Id*. at 675. Although the deputy's articulated reason for the stop was based on § 545.104**(a)**, the deputy admitted at the hearing that he had not see whether the defendant was signaling at the exact moment of the turn – though the deputy noted the defendant had not been signaling earlier, while within 100 feet of the turn. *Id*. at 670-71.

The trial court granted the motion to suppress and "made explicit findings of fact and conclusions of law that it obviously deemed dispositive of the motion to suppress." *Id*. at 674. However, the trial court only mentioned the fact that the deputy could not see whether the defendant was signaling *at the moment he turned*; the trial court made no finding regarding the deputy's testimony that the defendant was not signaling while he was within 100 feet of the turn. *Id*. at 674.

The Court of Criminal appeals found the trial court had erred to conclude its finding was dispositive of the motion to suppress. *Id*. Noting the standard was whether the deputy had some objective basis for the stop, the Court observed that "[i]t was uncontested – and the trial court did not find otherwise – that [Deputy] Sanchez was able to see ... that there was no turn signal flashing in the moments *before* the appellee made the turn, when the van was positioned within the last one hundred feet of the intersection." *Id*. at 675 (emphasis in original) (also citing § 545.104**(b))**.

The defendant tried to argue on appeal that the Court should "invoke the *Ross* presumption that the trial court simply disbelieved [the deputy's] uncontested testimony" related the observed violation of § 545.104(b). *Id*. However, the Court determined that:

> the more appropriate presumption, after *Cullen*, is that the explicit findings of fact that the trial court did enter are those it deemed "essential" to its ruling, and that it made no finding of fact whatsoever with respect to other fact or credibility issues because it regarded them (however erroneously) as peripheral or non-essential to its ultimate legal holding.

*Id*. at 675-76. The Court further observed that the omission of findings on the potentially dispositive issue constituted a "failure … to act" for purposes of Rule of Appellate Procedure 44.4, and that the court of appeals was authorized – and in fact, required – to first remand the cause for the entry of supplemental findings to avoid "appellate speculation" before it could affirm the trial court's judgment. *Id*. at 676-77 (citing Tex. R. App. P. 44.4).

In *Elias*, the trial court appears to have issued its findings *sua sponte*, and the State apparently did not object, point out the potentially dispositive issues, and request findings on those issues. *See id*. at 680 (Keller, P.J., concurring). While at first glance *Elias* would appear to require an abatement and remand for the State's requested potentially dispositive findings, the stronger procedural history underlying the instant case might support the conclusion that the trial court implicitly made findings which favor the State.

Unlike *Elias*, in the instant case, the State timely requested findings, filed proposed findings (with citations to the record), asked the trial court in the alternative to make its own findings on explicitly detailed potentially dispositive issues, and submitted a notice of past due findings, as noted by the Court in its Order. *State v. Garrett*, 03-17-00333-CR, 2017 WL 3044379, at *1 (Tex. App.—Austin July 14, 2017, no pet.) (not designated for publication). The Trial Court did not make findings before the record was submitted to this Court. This Court observed in its Order that it was abating the appeal and remanding the cause to the Trial Court so that it could state its "'essential' findings of fact and conclusions of law on the motion to suppress, as the trial court is required to do when requested by the losing party.... We abate the appeals and remand the causes to the trial court so that it can make its findings of fact and conclusions of law." *Id*. Despite the fact that the essential findings and the potentially dispositive issues were specifically requested by the State, the Trial Court declined to make any *express* findings – for or against the State – on the vast majority of those issues.

In such circumstances, the Court should view the Trial Court's continued refusal to make explicit findings to be an implicit recognition that the facts in the those issues were favorable to the State. In fact, this is not far removed from what ultimately happened in *Elias*. Following an abatement and remand in that case for findings regarding the deputy's testimony of a violation of § 545.104(b), the trial court stopped short of acknowledging the facts favored the State, finding only that:

....

7. Deputy Sanchez testified that he saw the van stopped at the intersection at the stop sign.

8. Deputy Sanchez testified that he passed the van going approximately 50 miles per hour and drove 30 yards north on Zaragosa, then turned around and conducted a traffic stop of the van, that was traveling south on Zaragosa, because 'it failed to signal a right turn from that stop.'

9. Deputy Sanchez testified that he passed the Defendant Elias while the Defendant was stationary in a lawful stop and that the Defendant hadn't committed a ticketable offense yet.

10. Deputy Sanchez testified that he did not see the Defendant, Abran Elias ('Elias'), fail to signal intent to turn right from his vantage point as he proceeded 30 yards away on Zaragosa.

The [trial] court also made the following conclusions of law:

1. Deputy Sanchez had no reasonable suspicion or probable cause to believe that Defendant Elias had committed a traffic violation in his presence while Defendant's Elias' vehicle was stopped at the intersection of Sombra del Sol and Zaragosa, in El Paso County, Texas.

2. The Court finds no reasonable suspicion to believe that the traffic violation charged occurred *or that Defendant Elias had committed a different traffic offense that would have supported the traffic stop, specifically, a failure to signal his intention to turn within a hundred feet of the intersection.*

....

*State v. Elias*, 08-08-00085-CR, 2012 WL 4392245, at *4 (Tex. App.—El Paso Sept. 26, 2012, pet. ref'd) (not designated for publication) (in which the court of appeals observed "[s]ignificantly, the trial judge did not make any express finding that she disbelieved any aspect of Sanchez's testimony, *including his testimony*

47

*that Elias' van was not signaling either a left or right turn when Sanchez approached and drove through the intersection*") (emphasis added). Recognizing that the trial court had refused to explicitly address the matter upon abatement, the court of appeals essentially determined the trial court had implicitly found the testimony was favorable to the State's position:

> In its supplemental findings, *the trial court has again failed to address Sanchez's testimony that the van's turn signals were not flashing when he approached the intersection and the court has not made an adverse finding on Sanchez's credibility on this dispositive issue.* Given that the *trial court has been given an opportunity to clarify whether it disbelieved any aspect of Sanchez's testimony and has chosen not to do so*, we conclude that the trial court believed all of Sanchez's testimony and the court did not make any explicit findings on this dispositive issue because it has erroneously regarded the findings as peripheral or non-essential.

*Id*. at *6 (emphasis added). The court of appeals then found that the deputy's testimony – that the van was not signaling while at the stop sign – necessarily meant the deputy had at least a reasonable suspicion that Elias had violated § 545.104(b) by failing to signal continuously for 100 feet prior to the turn. *Id*.

In the instant case, the Trial Court has arguably had *more* of an opportunity to make its essential findings; the State pointed out the potentially dispositive issues before the record was filed with the Court and filed a notice of past due findings, the case was abated for the Trial Court to make potentially dispositive findings, and the Trial Court's findings still do not explicitly address the issues pointed out by the State. Despite the fact that the State asked the Trial Court to state whether several of the Trooper's factual assertions were true or not, the Trial

Court's refusal to make any explicit finding – either for or against the State's position – indicates the Trial Court implicitly found the Trooper's factual assertions on said issues were true. Particularly when combined with the Trial Court's internally inconsistent and clearly erroneous findings,[43] in such circumstances – as in *Elias* following its abatement – because the Trial Court has already had multiple opportunities to make explicit findings, this Court should recognize it implicitly found the unaddressed facts were favorable to the State's position on the expressly identified potentially dispositive issues. *See id*. In the particular circumstances of this case, such a holding is logical, consistent with precedent, and supports judicial efficiency.

### E. Alternatively, the Court Should Again Abate and Remand the Case and Require the Trial Court to Make Explicit Essential Findings on the State's Requested Potentially Dispositive Issues.

As this Court observed in *State v. Dubord*:

In assessing whether reasonable suspicion existed, we consider the totality of the circumstances. [*Ford v. State*, 158 S.W.3d 488, 492–93 (Tex. Crim. App. 2005)].

When asked, the trial court must make findings of fact and conclusions of law adequate to provide us with a basis on which to review its application of law to the facts. *State v. Saenz,* 411 S.W.3d 488, 495 (Tex.Crim.App.2013). The trial court must make findings covering every potentially dispositive issue that might reasonably be said to have arisen in the course of the suppression proceedings. *State v. Elias,* 339 S.W.3d 667, 676 (Tex.Crim.App.2011). If findings are requested and made but provide an inadequate basis upon which to

---

[43] As detailed by the State *supra*.

49

make a legal conclusion, we must abate and remand to the trial court for additional findings.

*State v. Dubord*, 03-15-00553-CR, 2016 WL 858929, at *1 (Tex. App.—Austin Mar. 2, 2016, no pet.) (not designated for publication). In that case, because the trial court's findings and conclusions did not address the officer's testimony that "several events in addition to the lane changes ... formed the basis for the stop," including an observed speeding violation and other traffic offenses, the Court concluded the findings did not allow it to properly assess the suppression issue and abated and remanded the case for the necessary supplemental findings. *Id*. at *2.

Similarly, in *State v. Adams*, the State argued the trial court had erred in "refusing to file the more specific findings of fact requested by the State." 454 S.W.3d 48, 49 (Tex. App.—San Antonio 2014, no pet.). The court first determined what essential findings on potentially dispositive issues the trial court was required to make. *Id*. at 42-43. After reviewing the applicable law, the court observed that:

> ...the trial court's findings of fact and conclusions of law fall short of "covering every potentially dispositive issue that might reasonably be said to have arisen in the course of the suppression proceedings." Without further findings of fact, this court cannot determine whether the trial court's conclusions of law were in error. We conclude the State's requested specific findings of fact are pertinent and required to assure the "proper presentation of" this case on appeal.

*Id. at* 47–48 (citing, among others: *Elias,* 339 S.W.3d at 675-76; *Cullen,* 195 S.W.3d 696; Tex. R. App. P. 44.4).

To avoid unnecessary repetition, in the event the Court will not reverse the order of suppression on the current record, the State relies on its cited case law,

requested findings and argument, *supra*, to assert that the Trial Court in this case has precluded the "proper presentation of" this case on appeal. *See id*. Despite the State's particular requests[44] for findings on essential and potentially dispositive issues, the Trial Court's findings of fact and conclusions of law fall short of "covering every potentially dispositive issue that might reasonably be said to have arisen in the course of the suppression proceedings." *See Adams*, 454 S.W.3d at 47-48. This Court should therefore abate and remand the case a second time, with orders for the Trial Court to address the essential and potentially dispositive issues, including those specified in the State's *Supplemental Request* and its *Respectful Objection and Request for Additional Findings* (I C.R. at 31-39; III Supp. C.R. at 4-21). *See Adams*, 454 S.W.3d at 47-48; *Dubord*, 2016 WL 858929 at \*1-2; *State v. Mercantel*, 03-16-00820-CR, 2017 WL 74415, at \*1 (Tex. App.—Austin Jan. 4, 2017, no pet.) (not designated for publication); *Elias,* 339 S.W.3d at 675-76; *Cullen,* 195 S.W.3d 696; Tex. R. App. P. 44.4.

---

[44] *See* I C.R. at 31-39 (*State's Supplemental Request for Findings of Fact and Conclusions of Law*, citing to the record and case law in asking the Trial Court to make determinations as to "whether" certain testified-to facts occurred).

## V. PRAYER

WHEREFORE, PREMISES CONSIDERED, the State of Texas respectfully prays that this Honorable Court reverse the Trial Court's Order of Suppression and order the Motion to Suppress be denied in all things. Alternatively, the State prays that the Court abate and remand the cause to the Trial Court a second time and order said Court to enter explicit essential findings on the potentially dispositive issues in the case. The State also prays for all other relief to which it may be entitled.

Respectfully submitted,

/s/ Joshua D. Presley
**Joshua D. Presley**, SBN 24088254
preslj@co.comal.tx.us
Assistant Criminal District Attorney
Comal County Courthouse Annex
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130-5191
(830) 221-1300 Telephone
(830) 608-2008 Fax

## Certificate of Service

I, Joshua D. Presley, Assistant Criminal District Attorney for Comal County, Texas, hereby certify that a true and correct copy of the above and foregoing *State's Brief* was sent to BRANDOM GARRETT's attorney of record in this matter:

Lance S. Turnbow
lanceturnbow@hotmail.com
401-B South LBJ Drive, Suite 8
San Marcos, TX  78666
*Attorney for Defendant/Appellee*

By electronic service through efile.txcourts.gov to the above-listed email address on this, the 2nd day of January, 2018. A copy of this document will also be sent to the Trial Court's Administrator at: evansa@co.comal.tx.us today through efile.txcourts.gov for delivery to the Honorable Charles A. Stephens, II.

/s/ Joshua D. Presley
**Joshua D. Presley**


## Certificate of Compliance

I hereby certify, pursuant to Rule 9.4(i)(2)(B) and Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure that the instant brief is computer-generated using Microsoft Word and said computer program has identified that there are 14,850 words or less within the portions of this brief required to be counted by Rule 9.4(i)(1) & (2) of the Texas Rules of Appellate Procedure.

The document was prepared in proportionally-spaced typeface using Times New Roman 14 for text and Times New Roman 12 for footnotes.

/s/ Joshua D. Presley
**Joshua D. Presley**